IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE ACCOUNT 100039829740570 AND THE ACCOUNT ASSOCIATED WITH USERID "LILMAMAZ12", THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. __1:19-mj-353__ |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Megan Patricia Bennett, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with two certain accounts that are stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a company headquartered at 1601 Willow Road, Menlo Park, California, 94025. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the account, including the contents of communications.

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been since May 2009. I am assigned to the FBI Minot Resident Agency, and my work primarily consists of investigating felony crimes in Indian Country, including felony crimes on Fort Berthold Indian Reservation (FBIR), in North Dakota.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code §§ 2241(a)(1) (Aggravated sexual abuse) and 1153 have been committed by Kyle Elliot Miller.  There is also probable cause to search the information described in Exhibit A for evidence of the violations, as described in Exhibit B.  Specifically, I believe probable cause exists that Miller used Messenger, an application used within Facebook, Inc. accounts, to communicate with victim R.S. before and after Millers' alleged sexual assault of R.S.

## PROBABLE CAUSE

5.     On August 11, 2019 at approximately 10:58 A.M., Three Affiliated Tribes Dispatch Services ("TAT Dispatch") received a call from a female who identified herself as R.S. and stated she was reporting a rape on "Sanish Hill", and that "Kyle Lightning" had attacked her five or ten minutes prior to her call.  R.S. stated she was sore because he "had [her] arm behind [her] back and had [her] pinned down."  R.S. stated her brother, F.S., had walked in on the incident, and had punched her assailant and broken his car windshield.  The dispatcher who spoke to R.S. noted R.S. was crying and emotional during the call.  Three Affiliated Tribes Law Enforcement Officer Alex Klave responded to the specified address provided by R.S. and R.S. indicated to him (and later to additional investigators) that she was raped at the specified address, which is knows in the area as Sanish.  Your affiant knows the Sanish to be located within the exterior boundaries of FBIR.

2

6.      At approximately 11:32 A.M. and 11:35 A.M., a person identifying himself as Kyle Miller called TAT Dispatch.  Miller reported that he had been hanging out with friends and that F.S. had walked in and was flipping out because Miller was there.  Miller indicated that F.S. assaulted Miller and broke his vehicle's windshield.  Miller and the dispatcher communicated about where Miller should go, and Miller drove to the MHA Nation Public Safety & Judicial Center ("the judicial center) in New Town, North Dakota.

7.      At the judicial center, Three Affiliated Tribes Law Enforcement (TAT LE) Officer Coby Janis encountered Miller sitting in a black Chevrolet Impala with a broken windshield.  Miller told Officer Janis that F.S. had broken his windshield, after Miller had been "chilling with a friend" and been interrupted by F.S. when and he and the friend were "kind of doing [their] thing."  Miller named R.S. as his friend.  Miller produced photographic identification showing he was Kyle Elliot Miller, date of birth XX/XX/1989.  After Officer Janis received more information from other investigators, he detained Miller.  Miller was ultimately arrested on tribal sexual assault and criminal trespassing charges on August 11, 2019.

8.      TAT LE and Bureau of Indian Affairs investigators collected evidence from the sexual assault crime scene and interviewed of Miller.  R.S. was transported to Trinity Hospital ("the hospital") in Minot by a victim services advocate, where she received medical treatment and consented to the administration of a Sexual Assault Evidence Collection Kit ("the kit") by a Sexual Assault Nurse Examiner (SANE).

9.      R.S. was interviewed at the hospital by FBI SA Jonathan Nencka.  R.S. assisted SA Nencka in identifying her Facebook account, the main page of which featured photographs of her children with a specific, artificial hair color.  During the interview, R.S. did not use the name "Miller" to describe the "Kyle" who sexually assaulted her as she believed his last name to be

3

"Lightning." However, your affiant is using the name "Miller" because it was determined and verified that Kyle Miller was in fact the "Kyle" that R.S. was referring to in her report of sexual assault. On August 11 and 13, 2019, Miller confirmed that he engaged in sexual intercourse with R.S.

10.    R.S. told SA Nencka that she works at the Van Hook Travel Center ("the travel center"). R.S. knew Miller to have briefly worked at the travel center as a maintenance employee for a couple months before she went on maternity leave. When she returned from maternity leave in early July 2019, Miller no longer worked there. R.S. believed she spoke briefly to Miller only a couple times while he worked at the travel center. They were "friends" on Facebook as well. Miller tried asking her out, using Facebook, before he started working at the travel center. R.S. declined Miller's offer to go out.

11.    On August 10 and 11, 2019, Miller sent R.S. textual messages on Facebook. It was the first he had contacted her, since he had worked at the travel center. She told him she was not looking to be in a relationship. He called her and asked what she was doing and if she was alone, and she affirmed she was. She called him back, but he did not answer. Earlier in the day, on the same day she was assaulted (August 11, 2019), R.S.'s brother F.S. came to her house and told her a tall, skinny, sweaty man came to F.S.'s house, asking for her. F.S. lives in the house next to R.S. R.S. recalled that she "Inboxed" Miller right after F.S. told her this, telling him she didn't want anything to do with drugs and that he should not bother her. She never asked him to come over. She did not know how Miller knew where she lived, although she could have mentioned living in Sanish to him back when they worked together at the travel center.

12.    R.S. showed SA Nencka Facebook Messenger content in her cellular telephone. SA Nencka noted the content with having a day and time of "Saturday" (August 10, 2019) at

4

9:05 P.M., which was associated with a Facebook announcement that stated "Say hi to your new Facebook friend, Kyle." Two overlapping circles were featured on the announcement, along with "Kyle Miller" in large font. One circle contained the Facebook account profile picture featured on R.S.'s Facebook account page, as shown to SA Nencka by R.S. The other circle appeared to feature the silhouette outline, in grey tones, that is a profile picture default image.

13.     From 2:13 A.M. through 2:47 A.M., on August 11, 2019, the "Kyle Miller" Facebook account, through Messenger, sent R.S.'s account several short communications, asking what she was doing. At 8:11 A.M., R.S. responded, saying she fell asleep. At 8:24, Messenger reported a "Kyle" call. At 8:56 A.M. "Kyle" sent the message "shh" to which R.S. replied "??". At 9:00 A.M., R.S. called "Kyle." At some point between 9:00 A.M. and 10:04 A.M., R.S. sent "Kyle" the message "yo and if your on drugs than don't bother fr. I don't associate myself with that." R.S. followed with another message, saying her brother said it looked like Miller was "tweaking" and "stay away from me if that's what your on." At some point before 10:47 A.M., "Kyle" sent R.S. the message via Facebook "Making love is the best" to which R.S. replied, "I aint tryna fuck."

14.     R.S. was at home, not paying attention to the time. She heard knocking and, thinking it was her brother, opened the door. She said "you, what are you doing here?" "He," Miller, giggled and stepped in to her house. He said he had liked her for a while. She lifted up her hand and he grabbed it and twisted it behind her. He pushed up her hand and walked her over into the living room. He told her to bend over. He grabbed one side of her shorts, and when he pulled them down, the other side came down too. He pushed her onto the small grey couch, in a half-sitting, leaning back position. He put his head into her chest, lifted one of her legs over his shoulder, put "it" inside her, and starting thrusting his penis in her vagina. When he

was done with that after a while, he grabbed her by the back of her head and told her to turn around. She told him no. He grabbed the left side of her neck. She got up into a crawl position, and he grabbed her. She felt him spit on her rectum. He put his penis in her rectum. He thrust three or four times, and then F.S. walked in the house. F.S. kicked and punched Miller several times. F.S. dragged Miller towards the kitchen. By the time R.S. collected her shorts, F.S. and Miller were outside. During the assault, R.S. was telling him to get off, and stop. Miller just told her she was beautiful.

15.     In the kit's paperwork completed by the SANE, the SANE noted "redness" on the left side of R.S.'s neck.

16.     F.S. was interviewed by BIA SA Garry Sam. F.S. told SA Sam that when F.S. was in front of a vehicle at R.S.'s house, he heard R.S. screaming "no" and "stop." F.S. ran into the house and saw "Kyle" "getting in that position," meaning in a position to rape or have intercourse with R.S. F.S. indicated that R.S. appeared to be "in a provocative position" on the couch with her pants off and her hand twisted behind her back. Miller's pants were down to his knees. F.S. saw Miller's left hand was behind R.S.'s head, pushing R.S's face into the couch, and Miller's right hand was holding R.S.'s right arm twisted behind her back. F.S. "lost it" and began hitting Miller. F.S. ripped Miller's shirt and forced Miller outside and struck Miller's vehicle, including the vehicle windshield, with his bare fists. F.S.'s blows resulted in the windshield being "spiderwebbed." Miller said he would be back, and left in the vehicle.

17.     F.S. had never seen Miller before, except for the incident earlier that same day when Miller came to F.S.'s house at around 9:00 A.M. During that incident, Miller was mumbling and scratching his face. Miller finally managed to say R.S.'s first name. F.S. told Miller R.S. was at work and that Miller was "tweaking" and should leave. Miller left.

6

18.     At 10:47 A.M., via Facebook Messenger, "Kyle" sent R.S. the messages "Dayum" "u ok", and attempted to call her twice.  R.S. replied at 11:23 A.M. that what had happened was rape.  "Kyle" subsequently said she was a liar.

19.     Your affiant interviewed Miller and Miller stated that he and R.S. had consensual vaginal and anal sexual intercourse.  He denied having been under the influence of drugs.  He went to her house with the idea that something romantic might happen, because of the messages she was sending him on Facebook.  For example, she told him how she had seen him looking at her at the travel center.  Miller told me he deleted from his phone some of the messages she sent him.  Miller asserted that she only told him he could not come to her house if he was on drugs and he wasn't on drugs, therefore, he could not believe that he had been arrested for criminal trespass.

20.     Miller further stated that, prior to Sunday (the day of the alleged sexual assault), he had most recently seen R.S. at the travel center approximately two weeks earlier, but they did not speak to each other.  Before that brief sighting, he had not seen her in person for a year or more.  Despite this lack of personal contact, Miller said they just "hit it off" and that R.S. was "ready" when he started having sexual intercourse with her approximately eight minutes after he entered her home.

21.     R.S. and Miller are enrolled members of the Three Affiliated Tribes.

22.     On August 12, 2019, I located Facebook account profile pages which appeared to be attributable (based on their publicly available content, such as names and photographs) to R.S. and Miller.  R.S.'s page featured her face in her profile photograph, and her children with the specific artificial hair color mentioned in her interview by SA Nencka.  Miller appeared to have several Facebook accounts, but only one account featured R.S. as one of his "Friends" and also

had the grey-toned silhouette default image as his profile photograph.  The profile pages were located at www.facebook.com/lilmamaz12 and www.facebook.com/100039829740570 (collectively, "the profile pages").

23.     To preserve the content of the profile pages, I used a Facebook records preservation function provided by the company for the use of law enforcement officials.  Using the instructions provided by Facebook, I requested Facebook preserve the content of the profile pages.  I then received electronic responses from Facebook, Inc. notifying me that Facebook, Inc., took steps to preserve the content.

13.  You affiant knows that Facebook retains information provided or created by Facebook users, which includes friends lists and content of communications using Facebook and Facebook Messenger.

24.     Based on this information, your affiant believes there is information retained by Facebook that may provide information regarding communications between R.S. and Miller on the date when the alleged sexual assault occurred, and on the dates preceding and following the date of the sexual assault, when R.S. and Miller were communication via Facebook's Messenger application or service (see Exhibit B).  The content of the communications sent and received by R.S. and Miller is relevant to the allegation that violations of Title 18, United States Code §§ 2241(a)(1) and 1153 were committed by Miller on August 11, 2019.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

25.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook, Inc., to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of

Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

26.     Based on the forgoing, I request that the Court issue the requested proposed search warrant.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  See 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  See 18 U.S.C. § 2711(3)(A)(i).

27.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

28.     This second, and subsequent, affidavit and search warrant application are being submitted in accordance with United States v. Nyah, 928 F.3d 694 (8th Cir. 2019), which advises that when a third party recipient, such as Facebook, Inc., fails to provide the materials and information authorized by the original search warrant within the 14-days proscribed by Rule 41, the agent needs to seek a new search warrant with a fresh 14 days.  The first search warrant was executed on Facebook, Inc. on August 28, 2019.  Notification from Facebook, Inc. that Facebook, Inc. produced materials responsive to the first search warrant, was not received until September 26, 2019.  This additional search warrant will allow the undersigned agent authority to access and assess the information generated by Facebook, Inc., relative the aforementioned provided search warrant.

Dated and sworn to this 30th day of September, 2019.

Case 1:19-mj-00353-CRH   Document 1-1   Filed 09/30/19   Page 10 of 10

Respectfully submitted,

_Megan Bennett_

Megan Patricia Bennett
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 30th day of September, 2019.

CLARE R. HOCHHALTER.
UNITED STATES MAGISTRATE JUDGE

10